## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## COLUMBIA DIVISION

| | | |
|---|---|---|
| Jane Roe #2 as Parent of Jane Doe #3 (previously filed complaint), | ) ) ) ) | 3:24-cv-911-JDA |
| Plaintiffs, | ) ) | |
| vs. | ) ) | **COMPLAINT**<br>**(Jury Trial Demanded)** |
| The United States Figure Skating Association, Flight Fit N Fun Irmo, LLC D/B/A Plex Indoor Sports D/B/A Flight Fit N Fun Flight Holding Company, LLC, and Mark Cockerell, | ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

**TO:    DEFENDANTS AND THEIR COUNSEL:**

Plaintiff Jane Roe #2, complaining of Defendants, respectfully shows unto this Court and alleges as follows:

### SUMMARY OF ACTION

**1.**     The sport of figure skating in the United States is regulated in part by The United States Figure Skating Association ("USFS").

2.     Beginning when she was thirteen (13), in 2016, Jane Doe # 3 began figure skating at a rink in Irmo, South Carolina (Flight Fit N Fun Irmo, LLC D/B/A Plex Indoor Sports D/B/A Flight Fit N Fun Flight Holding Company, LLC – hereinafter, "FFF").

**3.**     While at this skating rink in Irmo, Plaintiff Jane Doe # 3 was introduced to a coach named Mark Cockerel (hereinafter, "Cockerell")

**4.**     Mark Cockerell is a former Olympian who was working as an employee of FFF.

5.      Cockerell was certified as a skating coach by The United States Figure Skating Association, the group whose responsibility it is to facilitate qualified and certified coaches to participate in figure skating in the United States, to monitor activities of certified coaches, and to provide guidelines for the safety of skating participants.

6.      Many of the participants in figure skating are under the age of eighteen (18) when they begin the sport.

7.      Children comprise a large segment of active figure skaters in the United States.

8.      The Plaintiff was under the age of eighteen (18) at all times interacting with Cockerell.

9.      During his time as a coach, Cockerell groomed, touched, and acted inappropriately with Plaintiff.

10.      The actions by all defendants in failing to prevent Mark Cockerell from sexually and emotionally abusing Jane Doe #3 caused her to undergo medical bills and care.

11.      Jane Roe #2 was responsible for all of Jane Doe #3's medical bills and care while Doe was under the age of 18 and this type of action is commonly referred to as a necessaries claim.

12.      All defendants in this matter were complicit in allowing the perpetration of the hiring, supervision, interaction, escalation, grooming, exploitation, harassment, and abuse of Plaintiff in this case.

13.      Sexual Misconduct is a comprehensive term that includes grooming, exploitation, sexual abuse, sexual harassment,  and sexual malfeasance.

14.      In addition to preventing sexual misconduct during the relevant timeframe, FFF had a duty to monitor, supervise, and conduct appropriate background searches and investigations into employees and to protect minor participants from potential harm and actual harm perpetuated by employees who had a clear propensity for sexual misconduct.

15.      Plaintiff was the victim of sexual misconduct by Mark Cockerell at FFF and facilitated by USFS during all times referenced in this complaint.

16.      Plaintiff has suffered immeasurable harm and will likely have to undergo

2

psychiatric/psychological care for the remainder of her life

17.     Defendants USFS and FFF acted in dereliction of their duties by failing to adequately monitor and police against such harm as perpetrated by Cockerell.

## PARTIES

**Plaintiff**

18.     Plaintiff Jane Doe #3 was  a minor while  interacting with Cockerell, skating at FFF and being a member of USFS.

19.     Jane Roe #2 is the mother of the minor Jane Doe #3.

20.     Jane Roe #2 and Doe #3 are  citizens and residents of Lexington County, South Carolina.

21.     Plaintiff is filing this action anonymously under the pseudonym Jane Roe #2 because the subject matter of this lawsuit could bring embarrassment and publicity to the Plaintiff and/or her family.

22.     Plaintiff's daughter, Jane Doe #3,  is uniquely vulnerable to the mental or physical harms of disclosure of her identity.

23.     Plaintiff and her daughter risk humiliation and embarrassment due to the necessary publication of intimate materials and allowing her to proceed with a pseudonym brings comfort.

24.     If the ability to proceed with a pseudonym is not allowed, Plaintiff and her daughter will experience further harm because of exercising their legal rights.

25.     If Plaintiff is  forced to disclose her identity, that disclosure will amplify the injuries that are at issue in this litigation.

26.     The public interest in the disclosure of Plaintiff's identity is minuscule and not outweighed by the substantial harm of revealing her identity.

27.     There will be no furtherance of justice by requiring the public disclosure of Plaintiff's identity.

28.     Once the Defendants are served and retain counsel, Plaintiff's identity will be revealed to Defendants in a confidential manner, if not already known.

29.     Defendants are not prejudiced by allowing Plaintiff to proceed anonymously, and any potential prejudice will be mitigated by the confidential disclosure of Plaintiff's actual identity.

30.     Plaintiff Jane Roe #2 recently found out her daughter had been sexually and emotionally abused by Mark Cockerell.

31.     She was not aware of such actions until her now adult daughter, Jane Doe #3, filed a lawsuit against defendants here on February 7, 2024,

32.     Once Jane Roe #2 became aware of the Jane Doe #3 lawsuit, she spoke to her daughter who revealed years of abuse at the hands of Cockerell.

33.     Jane Roe #2 only found out this this information about defendants and their connections with her daughter in early February 2024.

34.     Jane Roe #2 then deduced and discovered that the medical care provided to Plaintiff jane Doe #3 for a myriad of issues and extraordinary medical care provided to Jane Doe #3 by Jane Roe #2 was caused by the actions and/or inactions of Defendants.

**Defendant USFS**

35.     Defendant, The United Skates Figure Skating Association ("USFS"), is an organization created under the laws of the State of Colorado, having its principal place of business in Colorado Springs, Colorado.

36.     USFS is National Governing Body ("NGB") of Figure Skating, under its charter given by the United States Olympic Committee under the Ted Stevens Amateur Sports Act ("TSASA").

37.     As the NGB for Figure Skating, and as a condition of maintaining its charter with the USOC, USFS is mandated to provide adequate training, supervision, and security to protect the thousands of minor and young-adult member-athletes in U.S. Figure Skating from the ravages of sexual abuse.

38.     Specifically, USFS is required to provide supervision, safety, and security at its events as well as ensure that individuals it permits to be members of its organization are safe from sexual abuse and other misconduct.

39.     USFS has conducted substantial, continuous, and purposeful business activities in the State of South Carolina by holding events throughout the State of Carolina.

40.     USFS has member clubs in the State of South Carolina.

41.     USFS has a Chairperson mandated to ensure compliance of member clubs; with the SafeSport safety guidelines it promulgates.

3:24-cv-911-JDA

42.     USFS actively recruits young figure skaters from the State of South Carolina to attend competitions sponsored by and endorsed by USFS.

43.     USFS receives a constant source of funding from members of USFS in the State of South Carolina.

44.     As the NGB for figure skating in the United States, USFS adopted a membership program, whereby individuals register with USFS, undergo training from USFS or certified coaches and agree to abide by the USFS rules/regulations, to compete or otherwise participate in USFS sanctioned events.

45.     The general team "member" at USFS includes several different classes of membership, including coaches, and figure skaters.

46.     USFS has a hearing panel composed of USFS management agents that review complaints made to the board about an USFS Coach or member.

47.     Through its powers under USFS guidelines, the hearing panel is permitted to impose discipline against any offending USFS coaches or members, including but not limited to admonishment, suspension, permanent life ban, and other reasonable conditions.

**Defendant FFF**

48.     Defendant Flight Fit N Fun Irmo, LLC D/B/A Plex Indoor Sports D/B/A Flight Fit N Fun Flight Holding Company, LLC ("FFF") is a corporation, organized under the laws of one of the States of the United States and owns and operates an ice-skating rink in Irmo, South Carolina.

49.     Defendant FFF employed Mark Cockerell at all times alleged in this complaint.

50.     Defendant FFF appointed Mark Cockerell as the skating rink director owned by FFF.

51.    Defendant FFF is responsible for all actions of Mark Cockerell including by virtue of allowing Cockerell to acquaint himself with Plaintiff through his directorship and coaching at the ice-skating rink owned by FFF.

52.    Upon information and belief, at the time he became an employee of FFF, Mark Cockerell had been the subject of prior complaints against him from previous coaching employment.

53.    Had FFF done a proper investigation, Cockerell should not have been eligible for hire.

54.    Defendant FFF is an entity that employs and retains agents, servants, volunteers, and coaches that interact directly with minor children and young adults as an ordinary course of their responsibilities.

55.    Moreover, Defendant FFF expressly permits adult coaches to coach and interact with minor participants upon its premises, and it was foreseeable that adult coaches would interact with minor children.

56.    As such, all of Defendant FFF's employees, agents, volunteers, coaches, servants, and members are mandated reporters under South Carolina Law and have a legal obligation to report suspected emotional, physical, and sexual abuse of minors.

57.    The actions and omissions complained of occurred by and through the employees, agents, authorized representatives and/or officers and directors of FFF acting in the course and scope of their authority and/or with the knowledge of FFF.

**Defendant Mark Cockerell**

58.    Plaintiff is informed and believes that Defendant Mark Cockerell is an individual who currently resides in the State of Nevada.

59.    At all times herein alleged, Cockerell was a coach, mentor, member, employee, and advisor to Plaintiff Jane Doe #3.

**Duties/Roles of Defendants**

60.    During the time that the Plaintiff interacted with and her daughter Jane Doe #3 was coached by Cockerell, he was a member of USFS, certified as a coach by USFS and subject to USFS's rules/regulations, and required to comply with USFS' rules/regulations concerning sexual misconduct.

61.    During the time that the Plaintiff interacted with and her daughter Jane Doe #3 was coached by Cockerell, he was an employee of FFF and subject to supervision, monitoring, training, and policies and procedures of FFF.

62.    FFF is a member organization of USFS.

63.    Defendant USFS and FFF have the right or power to direct and control the way their employees and/or agents provide services for coaching and safety in ice skating and further have a duty to protect minor children and young adults engaged in ice skating.

64.    Defendants USFS and FFF have the right or power to direct and control the way their employees and/or agents hire, retain, monitor, supervise, and train staff under their employment or agency.

65.    Upon information and belief, Defendants USFS and FFF have rules, regulations, policies, procedures, and guidance on the ways they prevent sexual misconduct or child exploitation and have knowledge of how to prevent known sexual predators from harming participants in their ice-skating programs.

66.    Upon information and belief, Defendants, USFS and FFF have or should have rules, regulations, policies, procedures, and guidelines related to hiring practices, screening practices, and employee supervision upon hiring, which includes, at a minimum reasonable background checks and investigations, given the fact that any adult who works on behalf of USFS or FFF will interact with children.

67.    Defendants USFS and FFF have a non-delegable duty to provide employees and/or agents with adequate knowledge and training to prevent sexual misconduct and child exploitation occurring within their ice-skating programs.

68.    Before the events underlying this case, which have taken place since 2016, employees and/or agents of Defendants USFS and FFF had knowledge that Cockerell had been inappropriate with children or young adults under his coaching or mentorship.

69.    Before the events underlying this case began in 2016, Defendants' employees and/or agents had actual knowledge that a vulnerable population of children or young adults would be subject to sexual misconduct and exploitation if reasonable precautions were not exercised in hiring, supervision, monitoring

training, and employment of qualified coaches, employees and/or agents.

70.     USFS and FFF employees and/or agents had the opportunity to prevent the exploitation of vulnerable children, and yet, Defendants USFS and FFF engaged, certified, and employed predatory coaches, including Cockerell, who were likely to engage in sexual misconduct and exploit children and young adults.

71.     At all times relevant hereto, the coaches, employees and/or agents of Defendants USFS and FFF (with respect to the facts alleged herein) acted within the course and scope of their employment and/or agency with Defendants USFS and FFF.

72.     Defendants voluntarily undertook the duty of providing supposed "safety features" to prevent sexual misconduct and exploitation of children prior to the events in this case.

73.     Defendants USFS and FFF knew that minor children and young adults exposed to sexual misconduct or exploitation were at risk of unfathomable harm and knew that if children were sexually abused or exploited it would cause lifelong emotional harm and behavioral difficulties.

74.     The negligent, grossly negligent, reckless, willful, or wanton acts, omissions, and liability of Defendants includes that of their agents, principals, employees, and/or servants, both directly and vicariously, pursuant to principals of non-delegable duty, corporate liability, apparent authority, agency, ostensible agency, and/or respondeat superior.

## JURISDICTION AND VENUE

75.     The United States District Court for the District of South Carolina has jurisdiction over this case pursuant to 28 U.S.C. §1391.

76.     Since one of the Defendants and Plaintiff is located in Lexington County, South Carolina, the Richland Division of the United States District Court for the District of South Carolina is the proper federal division for this action.

## JOINT AND SEVERAL LIABILITY

77.    The above-named Defendants are jointly and severally liable for all damages alleged herein since their negligent, grossly negligent, reckless, and wanton acts and omissions, singularly, or in combination, are the contributing proximate causes of Plaintiffs' injuries, damages, and losses.

## FACTUAL ALLEGATIONS SUPPORTING THE CAUSES OF ACTION

**78.**    USFS  is recognized as the NGB for the sport of figure skating in the United States by both the United States Olympic & Paralympic Committee (USOPC) and the International Skating Union (ISU).

**79.**    As the NGB of U.S. Figure Skating, USFS has a duty to create policies and procedures, certify coaches properly, and create a culture of safety for all participants in U.S. Figure Skating.

**80.**    NGB's are in the position to advocate and ensure safety for Youth Sports Organization ("YSO")  participants because they receive money through membership and other ways.

**81.**    The YSO is the supposed beneficiary of the NGB of its sport.

**82.**    If the NGB fails in its mission, it places children and young adults at risk of sexual

**83.**    An entity recognized as an NGB for a YSO has certain responsibilities and authority.

**84.**    As the NGB for figure skating, Defendant USFS is supposed to fulfill its role in creating a safe environment for minor and young adult figure skaters in the following manner:

a.    Regulating the Sport: USFS is responsible for setting the rules and standards for figure skating in the United States.

b.    Organizing Competitions: USFS hosts national figure skating competitions, including the USFS Championships, and is responsible for selecting and sending U.S. athletes to international competitions, such as the World Championships and the Olympics.

c.      Athlete Development: USFS plays a significant role in athlete development. It identifies and nurtures young talent, provides training guidelines, and supports athletes at various levels.

d.      Coach Education and Certification: The organization is responsible for the certification and education of coaches. It ensures that coaches have the necessary skills and knowledge to train athletes effectively and safely without engaging in sexual misconduct and exploitation of participants.

e.      Promoting the Sport: As the NGB, USFS also works to promote the sport of figure skating on a national level, increasing its visibility and encouraging participation at all levels.

f.      Membership Management: The organization manages memberships for skaters, coaches, and officials. Membership often includes insurance coverage, access to competitions, and other resources.

g.      Ensuring a Safe Sport: U.S. Figure Skating is responsible for ensuring that the sport is safe for all participants. This includes implementing policies and procedures to prevent and address issues such as sexual abuse and harassment, in line with the U.S. Center for SafeSport guidelines.

h.      Fundraising and Sponsorship: The organization also handles fundraising and sponsorship to support its activities, athletes, and events.

85.    As the NGB of U.S. Figure Skating, USFS has the authority to represent and make decisions for the sport of figure skating in the United States and  international forums.

86.    The organization's role is crucial in maintaining the standards of the sport, supporting athletes, and ensuring the safety and integrity of figure skating.

87.    One of the most important (if not the most important) roles of a NGB regarding a YSO is the protection of its participants.

88.    Children are a vulnerable population.

89.    As such, children are foreseeable  potential victims for predatory adults if a NGB is negligent, grossly negligent, or reckless in their actions.

90.    For decades, NGBs have been on notice that youth sports provide a breeding ground for pedophiles.

91.     Preventing sexual misconduct and exploitation of children and young adults in YSO's is a critical and well-established responsibility of the NGB.

92.     Because of the well-understood nature of the risk to children when an NGB fails to perform its essential function, policies, procedures and guidelines have existed for decades to guide NGBs and similar organizations in their protective mission.

93.     These policies, procedures, and guidelines developed and honed over at least three decades are standard practice and the minimum level of protection that a functional NGB should implement.

94.     Some of the recognized ways that a NGB can help protect children from predators include:

a.      Background Checks: Conduct thorough background checks on all coaches, volunteers, and staff. This includes criminal background checks and checks against sex offender registries.

b.      Training and Education: Provide mandatory and continuous training for all coaches, volunteers, and staff on recognizing and preventing sexual abuse. This should also include educating them on appropriate boundaries and behaviors.

c.      Policies and Procedures: Develop and enforce strict policies regarding interactions between adults and athletes. This may include rules about one-on-one interactions, travel, and communication outside of practice times.

d.      Safe Sport Programs: Implement a Safe Sport program, which is designed specifically to protect athletes from abuse in sports. This includes policies, procedures, and educational components.

e.      Reporting Mechanisms: Establish clear and accessible reporting mechanisms for athletes, parents, and others to report any suspicions or incidents of abuse. Make sure there are multiple ways to report, and that the process is confidential.

f.      Responding to Reports: Have a clear plan in place for responding to reports of abuse. This should include an immediate response to ensure the safety of the child, an investigation, and involving law enforcement when necessary.

g.    Parent and Athlete Education: Educate parents and athletes about the risks of sexual abuse in sports, signs to look out for, and how to report concerns. Empower athletes to speak up.

h.    Monitoring and Supervision: Ensure adequate supervision during all team activities, travel, and events. Regularly monitor interactions between coaches and athletes.

i.    Limiting One-on-One Interactions: Implement policies that limit one-on-one interactions between adults and children, such as having meetings in view of others or leaving doors open.

j.    Regular Review and Updates: Regularly review and update policies and training programs to ensure they reflect the latest best practices in child and young adult protection.

95.    It is important that these measures are not just in place but are actively enforced and that the culture of the organization prioritizes the safety and wellbeing of its minor and young adult athletes.

96.    Collaboration with child protection experts and law enforcement can further strengthen these efforts.

97.    A YSO is a structured entity that provides athletic activities for children and adolescents.

98.    These organizations can range from local community-based clubs to larger, more competitive leagues and associations.

99.    A YSO's primary purpose is to offer organized sports to young people, and typically serves ages ranging from about 5 to 18 years old.

100.    YSO's typically offer structured sports programs in one or more sports, such as figure skating, soccer, basketball, baseball, gymnastics, swimming, track and field, and many others.

101.    These programs are usually divided by age groups and skill levels but can sometimes mix ages based upon skills and other criteria.

102.    Mixing age ranges can increase the risk of harm to minor children, for instance, when a child is paired with an adult.

103.    Youth sports organizations focus on developing athletic skills, understanding the sport, and physical fitness among young participants.

104.    Many of these organizations arrange or participate in regular competitions, tournaments, or leagues, providing opportunities for competitive play.

105.    Coaches, who may be volunteers (often parents) or paid professionals, provide training, instruction, and guidance to the young athletes.

106.    Beyond athletic skills, YSOs are supposed to instill values such as teamwork, fair play, respect, and discipline in young participants.

107.    These organizations often serve as important community entities, bringing together children and families from various backgrounds and fostering community spirit and involvement.

108.    During the actions and inactions complained of, FFF was a YSO operating in South Carolina whose athletes were primarily comprised of children and young adults.

109.    YSO's (including FFF) are responsible for ensuring the safety and wellbeing of their participants, which includes providing safe coaches, monitoring those coaches, creating policies and procedures to protect its participants, having safe facilities, and adhering to safe sport participant protection guidelines.

110.    YSOs  must comply with various regulations and guidelines, especially if they are affiliated with larger governing sports bodies at the state, national, or international levels.

111.    Many YSOs strive to be inclusive and accessible, offering opportunities for participation regardless of a child's skill level, physical ability, or socioeconomic background.

112.    YSOs play a vital role in the physical, social, and emotional development of children and adolescents. Providing a platform for young people to engage in physical activity, learn new skills, make friends, and develop a lifelong appreciation for sports and healthy living.

113.    When a YSO fails in its mission to provide a safe place for children to interact, by, for example, hiring or retaining a predatory coach, the results are foreseeable but catastrophic.

114.    In the case at bar, both USFS (the NGB) and FFF (the YSO) failed Plaintiff and created an atmosphere allowing her daughter's coach Mark Cockerell to engage in sexual misconduct and exploit her (Jane Doe #3).

## U.S. CENTER FOR SAFESPORT'S ROLE IN PROTECTING MINORS AND YOUNG ADULTS PARTICIPATING IN YSOs

115.    The U.S. Center for SafeSport (hereinafter, "The Center") is an independent, nonprofit organization based in the United States that plays a pivotal role in ensuring the safety and well-being of athletes, particularly within the Olympic and Paralympic movements.

116.    Its establishment was driven by recognition that children needed protection from abuse in sports, including sexual, physical, and emotional misconduct.

117.    The Center develops and implements comprehensive training and education programs for athletes, coaches, administrators, and others involved in sports.

118.    These programs focus on abuse prevention, recognizing the signs of abuse, and promoting a safe and respectful sporting environment.

119.    The Center is responsible for creating policies and guidelines to safeguard athletes from abuse.

120.    These policies are designed to set standards for conduct, establish safety protocols, and create a framework for reporting and responding to allegations of abuse.

121.    The Center has the authority to investigate allegations of abuse within the U.S. Olympic and Paralympic sports organizations.

122.    The Center can take disciplinary actions, including banning coaches or other individuals from the sport, based on the findings of particular  investigations.

123.    The Center provides a safe and confidential platform for athletes, coaches, and others to report incidents of abuse or misconduct.

124.    The Center is supposed to ensure that these reports are handled appropriately and investigated thoroughly.

125.    The Center offers support services to individuals affected by abuse in sports.

126.    This support can include counseling, legal assistance, and other forms of support

127.    Beyond its investigative and regulatory roles, the Center advocates for a culture change within sports organizations, promoting environments where athletes' safety and well-being are paramount.

128.    The Center works closely with various sports organizations, including national governing bodies, to ensure the implementation of SafeSport policies and practices across all levels of sports.

129.    By fulfilling these roles, the Center aims to address the issues of abuse and misconduct in sports, ensuring a safer, more respectful, and inclusive environment for athletes of all ages and levels.

130.    The Center plays a crucial role in aiding U.S. Figure Skating and Figure Skating YSOs.

131.    The Center has mandatory training programs for coaches, officials, and athletes.

132.    This training focuses on recognizing, reducing, and responding to signs of sexual misconduct.

133.    The Center also provides educational resources for parents and athletes to create a more informed community.

134.    The Center requires background checks for coaches, officials, and anyone who has regular contact with athletes. This is an essential step in ensuring a safe environment for athletes.

135.    The Center provides a platform for reporting abuse and misconduct.

136.    The Center is responsible for investigating reports of abuse within the U.S. figure skating community and has the authority to impose sanctions or take other corrective actions.

137.    The Center is supposed to advocate for athlete safety and provides support services for victims of abuse.

138.    The Center collaborates with USFS to ensure compliance with safety policies.

139.    The Center also monitors the implementation of child safety and athlete participant policies across all levels of the sport.

140.    Beyond enforcing policies, the Center aims to foster a culture within figure skating that prioritizes athlete well-being, respect, and safety.

141.    By performing these functions, the Center plays a pivotal role in ensuring that figure skating environments are safe and healthy for all participants, particularly young athletes

### THE COLLABORATION OF U.S. CENTER FOR SAFESPORT, USFS AND FFF

142.    The Center, USFS and FFF are supposed to be collaborative partners in ensuring the safety of minor age and young adult figure skaters.

143.    The Center is a repository of information on prospective and already certified coaches.

144.    If the Center receives a complaint on a coach, it supposed to investigate that coach or do something to substantiate or verify any potential complaints of harm to a participant in U.S. Figure Skating by a coach.

145.    The Center is then able to work with USFS or FFF in verifying whether a coach has received complaints.

146.    If the Center has information on a coach that may be indicative of potential harm to children, it should be shared with a certifying organization (here, USFS).

147.    USFS and FFF must work with The Center in a collaborative effort to protect children and young adults.

148.    USFS uses information from the Center as part of its process in certifying coaches.

149.    A coach who has credible allegations of sexual misconduct or exploitation of a child or young adult against them should not be certified.

150.    This USFS certification process serves as a representation to the public that a particular coach has been vetted and passed several standards to receive a certification.

151.    FFF relies on USFS for the certification of a coach.

152.    Nevertheless, FFF is also independently responsible for the appropriate hiring, training, and retention of employees, including continuous monitoring.

153.    If USFS fails to properly implement its certification process, or FFF fails in the hiring (which includes working with USFS and The Center), supervising and monitoring of a predatory coach, the coach will, by virtue of his certified status, encounter children, which is likely to result in irreparable harm.

154.    That is what happened in this case.

155.    The Defendant USFS failed in its certification and oversight of Cockerell, and FFF failed in its hiring, supervision, training, monitoring, retention, and implementation of its policies and procedures, resulting in irreparable harm to Jane Doe #3 while a minor and resulting in harm to Jane Roe #2.

156.    Even if The Center had  never been notified of any issues with Cockerell, FFF and USFS breached the center policies in allowing an environment which facilitated and allowed Plaintiff's daughter  to be subjected to inappropriate interaction with Cockerell, inappropriate touching and fondling, and  sexual abuse which resulted in harm including the payment of medical bills and care resulting in damages to Jane Roe #2.

## GROOMING

157.    "Grooming" refers to the process used by predators to manipulate, gain trust, and establish control over their intended victims for abusive purposes, often leading to sexual abuse or exploitation.

158.    This behavior is particularly concerning when it involves children or vulnerable individuals.

159.    The grooming process typically involves a predator and potential victim.

160.    The predator identifies a potential victim.

161.    This choice may be based on the victim's perceived vulnerability, such as emotional neediness, isolation, or low self-esteem.

162.    The predator establishes a relationship and gains the victim's trust.

163.    This can be done through attention, affection, kindness, or by fulfilling their emotional or material needs.

164.    In the case of child grooming, this could involve befriending the child's family to gain access to the child.

165.    The predator identifies and exploits a need or void in the victim's life.

166.    The predator  might position themselves as a mentor, a protector, a benefactor, or even a romantic interest.

167.    Gradually, the predator works to isolate the victim from others, such as friends and family, who might protect them or notice the abusive behavior.

168.    This isolation further increases the victim's dependency on the abuser.

169.    Once a degree of isolation and trust is achieved, the predator may begin to introduce sexual content or behavior into the relationship, often gradually desensitizing the victim.

170.    The predator may use secrecy, blame, or even threats to keep the victim silent about the nature of the relationship.

171.    This control can be psychological, emotional, and sometimes physical.

172.    The final stage is the abuse or exploitation of the victim, which can be sexual, emotional, and/or physical.

173.    Grooming can occur in various settings, including in-person interactions, as well as through digital means such as social media, online gaming, and messaging apps.

174.    Predators can be adults or even older youths, and they may be strangers, acquaintances, or individuals in positions of authority and trust, such as coaches, teachers, or family members.

175.    Understanding and recognizing the signs of grooming is crucial for the prevention of abuse.

176.    Education on this topic is vital for parents, educators, and anyone who works with children or vulnerable populations, as it can help them identify and intervene in potentially abusive situations.

177.    For several decades, YSOs and NGBs have acknowledged and been well-aware of the threat of grooming, particularly among adults who interact with children and the children served by a YSO.

178.    FFF and USFS were aware of the risk of grooming at time of Cockerell's coaching certification and hire and should have created and implemented policies and procedures to address this threat at that time.

**IMBALANCE OF POWER OF COACHES IN YSOs CAN LEAD TO ABUSE**

179.    An imbalance of power between coaches and athletes in YSOs can create an environment that may allow for the abuse of children and young adults, including sexual, emotional, and physical abuse.

180.    This imbalance arises from the inherent authority, trust, and influence that coaches have over young athletes, and can be exploited by those with malicious intent.

181.    Coaches often hold significant authority over young athletes, including decisions about their playing time, position, and progress within the sport.

182.    This authority can be misused to coerce or manipulate children or young adults into complying with inappropriate demands.

183.    Children and young adults typically place a great deal of trust in coaches, viewing them as mentors, role models, and authority figures.

184.    Abusive coaches can exploit this trust to create a secretive, compliant environment.

185.    Children participating in YSOs may depend on their coaches for their athletic success and opportunities.

186.    This dependency can make them vulnerable to exploitation, as they may fear that speaking out could jeopardize their sports career or relationships.

187.    Coaches can isolate athletes from their peers and family, often under the guise of special attention or private coaching.

188.    This isolation can be used to prevent others from witnessing the abuse or the child from seeking help.

189.    Coaches can engage in grooming behaviors, building a seemingly trusting relationship with the child and possibly the child's family, to gain their confidence and manipulate the situation to their advantage.

190.    The power dynamic can allow coaches to intimidate athletes into silence, using threats of repercussions on their sports career or by manipulating their perception of what is acceptable behavior.

191.    In some YSOs, there may be inadequate supervision or oversight of coaches, providing opportunities for abuse to occur without detection.

192.    A culture that overly emphasizes winning and success in sports can contribute to a power imbalance, where athletes feel they must tolerate inappropriate behavior to succeed.

193.    The power held by the coach can lead to underreporting of abuse.

194.    YSO participants  might fear not being believed, or they might not recognize the behavior as abusive due to the trust and authority invested in the coach.

195.    Without proper education and training about appropriate coach-athlete boundaries and the signs of abuse, both athletes and coaches may not recognize or report abusive dynamics.

196.    To combat these issues, it is crucial for YSOs to implement stringent policies, offer education on appropriate boundaries, ensure proper oversight and reporting mechanisms, and foster a culture where athletes feel safe and empowered to speak out.

## JANE ROE #2's DAUGHTER JANE DOE #3'S INTERACTIONS WITH MARK COCKERELL

197.    Jane Doe #3 met Mark Cockerell in 2016 when she  was thirteen (13) years old.

198.    On the day of her first meeting with Cockerell, Jane Doe #3 was in a public skating session where Cockerell approached her and said she should sign up for the Learn-To-Skate group class.

199.    Jane Doe #3 later began group lessons at FFF in July, 2017 when she was fourteen (14) years old.

200.    Cockerell was the coach in most of these classes and there were several times Jane Doe #3 was the only skater that showed up to class.

201.    During this individual time, Cockerell began to make suggestive and inappropriate comments to Jane Doe # 3, telling her, among other things: "You have the perfect body for a skater" and "You have amazing legs".

202.    Cockerell then pursued Jane Doe #3 for the rest of 2017 to take private lessons, telling her he would give her "Extra Time".

203.    In 2018 when Jane Doe #3 was fifteen (15), she began taking private lessons with Cockerell.

204.    The grooming and manipulative behavior of Cockerell began to intensify.

205.    Cockerell then began touching Jane Doe #3 inappropriately in ways that constitute sexual assault.

206.    Cockerell touched Jane Doe #3's stomach, inner and outer thighs, hips, and the top of her butt.

207.    He would place his arm around her in a way that positioned his fingers on the side of Jane Doe #3's breast.

208.    Jane Doe # 3 was fifteen (15) at the time.

209.    Cockerell would whisper things to Jane Doe #3 like "I love you so much" or "I love you sweetie/dear" and other times he would say, "You're the most special girl in my life".

210.    Jane Doe #3 never responded to these perverse communications by a man more than forty years older than her.

211.    Cockerell got upset at Jane Doe #3 and asked her why she never told him that she loved him, but she simply answered with "I don't know" and ended her lesson early.

212.    At the end of most of Jane Doe #3's lessons, Cockerell would give her a very long hug and tell her he loved her.

213.    During the time that Cockerell was coaching Jane Doe #3, Defendants USFS and FFF should have had a policy in place to prohibit one on one contact between athletes and coaches as well as the means to implement these policies and should have been rigorously ensuring that coaches abided by these policies.

214.    The manipulation by Cockerell of Jane Doe #3 also involved body shaming.

215.    Though Jane Doe #3 was on the smaller side, Cockerell convinced her she needed to lose weight so her jumps would look better.

216.    Cockerell would compare Jane Doe # 3 to other skating students and say, "they are so skinny that's why they're so good"

217.    He told Jane Doe #3 that her stomach was not flat enough and her legs were not small enough and told her she needed to work on her butt.

218.    During all times that Jane Doe #3 was a student of Mark Cockerell, she was a member of USFS and a paying athlete at FFF.

219.    Jane Doe #3 developed an eating disorder which led to a purging disorder and ultimately her losing almost 20 pounds in two weeks due to Cockerell's continuous emotional abuse.

220.    Jane Doe #3 was diagnosed with a permanent health issue because of her eating disorder, and she struggles with these issues to this day.

221.    Cockerell also told Jane Doe #3 she was not allowed to have a boyfriend because that would take time away from Cockerell and he would say  "I need more time with my "jane Doe #3" girl".

222.    Whenever Cockerell  saw Jane Doe #3 talk to a boy at the rink or texting on her phone, he would approach Jane Doe #3 and say, "No boys".

223.    Cockerell forced Jane Doe #3 to wear a skating dress to her lessons at least once a week or he would not give her lessons.

224.    When Jane Doe #3  wore her skating dresses or short skirts, she caught Cockerell constantly staring at her.

225.     Cockerell gave Jane Doe #3  free lessons  and would tell her mother  it was because Jane Doe #3 supposedly  making playlists for the rink.

226.    During summers while Cockerell coached Jane Doe #3,  Cockerell would offer Jane Doe #3 free days of summer camp, which was run by and through FFF.

227.    He told Jane Doe # 3 it was because he wanted to spend more time with her.

228.    On multiple occasions, Cockerell also badgered Jane Doe #3 with statements about how he wanted her to live with him.

229.    These statements happened while Plaintiff Jane Doe # 3 was a minor.

230.    Cockerell would tell her  "if you lived with me, I would give you the world because you are such a special girl to me."

231.    He told her all the time that once she turned eighteen (18), she needed to move in with him.

232.    In October of 2020, one week before Jane Doe #3  turned 18, during her lesson, Cockerell asked her,  "so are you coming to live with me now that you're going to be an adult?"

233.    Jane Doe #3 replied "No I'm not doing that" and Cockerell stared at her, shook his head, ended the lesson early and that was the last lesson he ever gave her.

234.    From that day on, he was condescending and rude to Jane Doe #3.

235.    In late 2021, Cockerell attempted to talk Jane Doe #3 into being his student again and saying he  noticed how much "prettier" and "lighter" she had become.

236.    Cockerell tried to touch Jane Doe #3, but she  pushed his hands off her.

237.    During her time as an athlete at FFF, Plaintiff Jane Doe # 3 observed Cockerell inappropriately interacting with, kissing, hugging, and touching minors to prepare those same minors to have intercourse with him once they turned eighteen (18).

238.    Cockerell  thought touching minors inappropriately skirted the law, but an adult is not allowed to touch and fondle minor children.

239.    Cockerell's isolation and abuse of Jane Doe #3 caused her irreparable and permanent injuries and damages, including development of an eating disorder, and depression which escalated into self-harm.

240.    Cockerell's actions towards Jane Doe #3 resulted in harm to Jane Doe #3.

241.    The harm to Jane Doe #3 caused her to undergo medical care.

242.    Jane Roe #2 was responsible for the payment of Jane Doe #3's medical care while jane De #3 was a minor.

243.    Jane Roe #2 spent  money for Jane Doe #3's medical care and provided Jane Doe #3  extraordinary medical care in her home which was caused by actions and/or inactions of Defendants.

## **BREACHES OF DUTIES BY DEFENDANTS**

**244.**    USFS, FFF and Cockerell had duties to protect Jane Doe #3 from sexual misconduct and exploitation.

**245.**    USFS was a NGB that certified Cockerell.

**246.**    USFS was responsible for vetting Cockerell prior to certifying him as a coach, including investigating complaints that had previously been made against him with the NGB.

**247.**    USFS also had a duty to ensure that all its certified coaches were trained properly, were provided policies and procedures of proper interaction with minors and it protected minor members of USFS from predatory coaches.

**248.**    USFS is supposed to have a repository of all complaints against coaches.

**249.**    Upon information and belief, prior to coming to Irmo, Cockerell was the subject of complaints by other athletes alleging sexual misconduct.

**250.**    At all times relevant, Cockerell has been an adult male and decades older than his victims.

**251.**    Upon information and belief, his maltreatment and abuse did not begin in Irmo, South Carolina.

**252.**    Cockerell has coached at various locations, including Wooster, Ohio.

**253.**    Upon information and belief, there was more than one person who had complaints about Cockerell touching them inappropriately in Wooster, Ohio.

254.    FFF had a duty to appropriately vet coaches who would foreseeably meet minor athletes.

255.    FFF had a duty to prevent one-on-one interaction between an adult coach and a minor athlete.

256.    FFF had a duty to train its coaching staff, including those who would come into close contact with Cockerell, about signs, patterns, and behaviors indicative of predatory behavior, as well as the duty to report all allegations of inappropriate conduct between and adult coach and an athlete.

**257.**    FFF had a duty to protect Jane Doe #3 from the actions of Cockerell.

**258.**    Cockerell's actions were open and apparent to other FFF coaches and other students.

**259.**    Upon information and belief, Cockerell had been reported to USFS on multiple occasions, but USFS failed to act upon these complaints, disregarding these complaints in favor of a revered coach who was a major figurehead in the sport.

260.    Additionally, if Cockerell had complaints about him and a competent investigation performed, then his prior bad acts should have been discovered.

261.    USFS, FFF and Cockerell failed to protect Jane Doe #3, failed to supervise and monitor Cockerell, failed to train their employees, agents, and those responsible for oversight and leadership, and failed to appropriately vet and evaluate potential coaches who would foreseeably interact with minor children.

262.    The Defendant's actions and/or inactions led to harm and permanent injuries to Plaintiff Jane Doe # 3 and Jane Roe #2's responsibility pay for and provide medical care to her daughter..

### FOR A FIRST CAUSE OF ACTION
### AS TO ALL DEFENDANTS

### (Jane Roe #2's - Necessaries claim)

315.    Plaintiff reallege and reincorporate all above paragraphs herein verbatim.

316.    Jane Roe #2 is a nurse by profession.

317.    As such, when she has to provide medical care or extraordinary personal care for her daughter in a nursing capacity, that is part of her necessaries claim.

318.    As a direct and proximate result of the acts and/or omissions described herein, Jane Doe #3 suffered damages, including, but not necessarily limited to, the following:

      a.    Substantial medical expenses that are certain to occur for a significant amount of time, if not for the rest of Jane Doe #3's life;

      b.    Substantial life-care expenses that are certain to occur for a significant amount of time, if not for the rest of Jane Doe #3's life;

      c.    Substantial injury to Jane Doe #3's psyche and general emotional state; and,

      d.    Substantial loss of enjoyment of life.

319.    As a direct and proximate result of the acts and/or omissions as described herein, Plaintiff Jane Roe #2 has suffered and will, in the future, suffer damages, including, but not limited to, the following:

      a.    Substantial medical expenses which Jane Roe #2 has paid for Jane Doe #3;

b.      Substantial life-care expenses that are reasonably certain to occur for a significant amount of time, if not for the rest of Jane Doe #3's life which Jane Roe #2 will have to pay for;

c.      Care related to Jane Doe #3's disability that occurred while Jane Doe #3 was a minor;

d.      The provision of extraordinary medical care to Jane Doe #3 while she was a minor; and

e.      The general expense of obtaining resources for Jane Doe #3  before she turned the age of eighteen.

320.    Plaintiff Jane Roe #2 (as the parent of Jane Doe #3) was responsible for the medical bills, medical care, and overall care for her minor child until the age of eighteen.

321.    If the Jane Doe #3  is under a disability, she may be required to undergo care for an undetermined length of time after she reaches eighteen years of age.

322.    Plaintiff Jane Roe #2 also suffered other economic damages, including, but not limited to, the provision of extraordinary medical care, life care expenses, transportation costs, counseling services, and special programs for children because of Defendants' actions and inactions.

323.    Plaintiff Jane Roe #2 should be awarded all damages flowing from any necessaries claim or any other economic damages she has suffered because of Defendants' actions and/or inactions.

**MCGOWAN, HOOD, FELDER & PHILLIPS, LLC**

s/S. Randall Hood
S. Randall Hood, SC Fed ID 6103
Chad A. McGowan, SC Fed ID 6620
1539 Health Care Drive
Rock Hill, SC 29732
Phone: (803) 327-7800
Facsimile: (803) 324-1483
rhood@mcgowanhood.com
cmcgowan@mcgowanhood.com

**STROM LAW FIRM, LLC**

Bakari T. Sellers, SC Fed ID 11099
Jessica L. Fickling, SC Fed ID 11403
6923 N. Trenholm Road, Suite 200
Columbia, South Carolina 29206
Phone:  (803) 252-4800
Facsimile:  (803) 252-4801
Email:  bsellers@stromlaw.com
          jfickling@stromlaw.com

February 22, 2024